311 A.2d 844.

JANE E. GORDON *vs.* CAMPANELLA CORPORATION AND SHERRY M. MARIN *vs.* SERVICE CONTRACTING, INC.

SHERI GORDON, *p.p.a. vs.* CAMPANELLA CORPORATION AND SHERRY M. MARIN *vs.* SERVICE CONTRACTING, INC.

NOVEMBER 14, 1973.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

418

KELLEHER, J. This negligence action arose as a result of an automobile collision in Newport. The plaintiffs are Jane E. Gordon, her husband John,[1] and their daughter, Sheri (the Gordons). The defendant, Campanella Corporation (Campanella), impleaded Service Contracting, Inc. (Service Contracting) as a third-party defendant. A justice of the Superior Court granted Service Contracting's motion for a directed verdict. The jury returned a verdict for Campanella. The trial justice granted the Gordons' motion for a new trial. Campanella appeals the grant of the new trial and the directed verdict.

On Monday, April 21, 1969, Service Contracting began painting the structural steel on a bridge that Campanella

---

[1] At the beginning of the trial the husband was added as a party plaintiff. He seeks property and consequential damages. Sheri's suit was brought by her mother.

had built over Admiral Kalbfus Road. The contractual documents in evidence identified this bridge as Bridge 908. Admiral Kalbfus Road is a four-lane divided highway with two lanes being used for westbound traffic while the other two lanes serve the eastbound traffic. During this particular day, the painter's truck was parked under the overhead span in the westbound travel[2] lane up against the northerly curb. Its employees were occupied in painting the northerly portion of the bridgework to a point 15 feet out from the abutment. Because there was concern that cars passing under the bridge might be splattered with paint, a barricade had been set up at a point some 200 yards east of the overpass so that the westbound traffic would be diverted into the eastbound passing lane where it would proceed westerly to an opening in the median strip just beyond the overpass and then reenter the westbound lanes. A Newport police officer had taken a position in front of the barricade and directed the westbound traffic through a gap in the median divider into the inner lane.

At 3:30 p.m., Mrs. Gordon was driving her automobile in the eastbound travel lane.[2] Shortly before the underpass, Mrs. Gordon came upon a truck in front of her that was either stopped or moving slowly. Mrs. Gordon entered the eastbound passing lane and started to pass the truck. Within a matter of seconds, there was a head-on collision between the Gordon vehicle and one operated by Sherry M. Marin.[3] The Marin vehicle had been directed into the

---

[2]The term "travel lane" is used to note the northernmost lane for the westbound traffic and the southernmost lane used by the eastbound traffic. "Passing lane" describes the lane in either half that is closest to the highway divider.

[3]The Gordons sued Campanella and Sherry M. Marin. The trial justice directed a verdict for Sherry M. Marin on the basis that she had been confronted with a sudden emergency.

passing eastbound lane. The occupants of both auto-
mobiles were injured. The Gordons maintain that Cam-
panella was negligent because of its failure to warn the
eastbound travelers that they were going to encounter two-
way traffic once they arrived in the area of the underpass.

We will first consider the grant of the new trial and
then consider the grant of the directed verdict for the
painter.

The modern gospel as to a trial justice's obligation in
considering a motion for a new trial is to be found in
*Barbato* v. *Epstein*, 97 R. I. 191, 196 A.2d 836 (1964). A
studied consideration of that case makes it quite clear
that in this jurisdiction a trial justice, when acting on
such a motion, might be classified as "a thirteenth juror"
because he brings into play his more experienced judg-
ment by independently reviewing all of the material evi-
dence in the light of his charge to the jury, passing upon
the weight thereof, and assessing the credibility of the
witnesses who have appeared before him. In performing
this all-important task the trial justice can reject some
evidence or testimony, either because it was impeached or
contradicted, or because other circumstances render it in-
herently improbable; he may also draw inferences which
are reasonable in view of other testimony and the evidence
which are in the record.

Once the trial justice has scrutinized the evidence in the
fashion described here, he must make one of two choices.
In those instances where his judgment tells him that the
particular evidence and the reasonable inferences to be
drawn therefrom are so nearly balanced that reasonable
men could arrive at different results in the consideration
of the case, he is obliged to deny the motion and affirm
the verdict. However, if his judgment tells him that the
jury's verdict is against the fair preponderance of the
evidence and thereby fails either to do justice to the

parties or to respond to the merits of the controversy, the motion must be granted and the verdict set aside.

The rule has been firmly fixed that when a trial justice follows the route laid out in *Barbato,* the appellant must persuade this court that the trial justice in deciding the motion was obviously mistaken in his judgment or overlooked or misconceived material evidence on a controlling issue in the case. *Roberts* v. *Wills,* 108 R. I. 586, 277 A.2d 754 (1971).

Campanella argues that a trial justice in considering a motion for a new trial is precluded from completely substituting his judgment for that of the jury and thereby encroaching on its function as the ultimate finder of fact. A ready response to this contention was made many years ago when it was said that every time a new trial is granted on the ground that the verdict is contrary to the evidence, there is indeed a substitution of the trial justice's conclusion for the finding of the jury. *Speigel* v. *Grande,* 45 R. I. 437, 123 A. 560 (1924).

The trial justice charged the jury that if it found that Campanella was not responsible for the method of traffic control being employed on the approaches to Bridge 908, a verdict should be returned in favor of the contractor. However, he stated that if Campanella was responsible for the traffic pattern which Mrs. Gordon encountered as she traveled eastward on Admiral Kalbfus Road and the contractor handled the traffic pattern in a negligent fashion, then the jury was obliged to hold Campanella responsible for the results of its negligence.

The work being done by Campanella related to the improvement of the approaches to the new Newport-Jamestown Bridge. It was being performed pursuant to a contract entered into by the State of Rhode Island and Campanella. The contract price was in excess of five

million dollars and provided for the relocation of a portion of Route 138, the reconstruction of a portion of Admiral Kalbfus Road, the installation of ramps leading to and from Route 138, the construction of some temporary by-pass roads, and the erection of six bridges. The bridges had been completed in the early winter of 1969 and were ready for painting in the spring of 1969. Incorporated and made part of the contract was the State of Rhode Island Standard Specifications for Road and Bridge Construction, 1965 Revision, commonly referred to as the "blue book." The blue book contains close to 400 pages and is replete with stipulations covering a myriad of situations including such matters as pavement marking and the composition of manure that might be used in landscaping the roadside.

Campanella's top men on the jobsite were its bridge superintendent and its road superintendent. The bridge superintendent looked after the building of bridges while the road superintendent's duties involved the construction of roads. As it seeks to preserve the jury's verdict, Campanella stresses the testimony of its bridge superintendent. This individual testified that he did not order the placement of barricades which had channeled the westbound traffic into the eastbound passing lane. He also stated that none of his personnel were in the area. The superintendent also asserted that he had no contact with the Newport police department. He did not know who had placed the "great big barricades" 200 yards east of the overpass, but he agreed that a single person could not lift the barricade by himself. The barricades had been purchased by Campanella and the state had reimbursed the contractor for this expenditure.

The superintendent conceded that he was busy building bridges. He also acknowledged that other than driving on them he did not know much about the by-pass roads,

ramps, highway construction and relocation involved in Campanella's fulfillment of its commitment in the other portions of the contract. During cross-examination, he admitted that while there were no Campanella men working under the bridge, some were working to the east of the span. Testimony was adduced showing that Campanella's trucks were moving in and about the barricade and the underpass as they carried gravel from one portion of Route 138 to another. A picture taken within an hour of the crash shows two men with shovels on the southerly side of the bridge embankment. The bridge superintendent was positive that the men were not bridge builders, but he did not know if the shovelers belonged to the road-building section. The road-building superintendent agreed that it was possible that some grading work could have been going on on the roadside near where the officer stood directing traffic. Campanella's safety engineer said that any one of a number of his associates could have requested the police. He also said that the shovelers were part of the road detail.

In granting a new trial the trial justice placed particular stress upon sections 107.07 and 107.10 of the blue book. These sections relate to the public convenience and safety and the contractor's obligation to furnish barriers and warning signs. In pertinent part section 107.07 not only stipulates that the contractor shall conduct the work at all times in such a manner as to insure the least possible obstruction to traffic, but it requires the contractor to take "* * * all precautions necessary and reasonable for the protection of all persons * * *." Section 107.10 obligates a contractor to take all necessary precautions for the protection of the work and the safety of the public by the erection and maintenance, even, if necessary, at his own expense, of "* * * all necessary barricades, suitable and sufficient lights, danger signals, signs and other traffic

control devices * * *." "Suitable warning signs", so reads this section, "shall be provided to properly control and direct traffic."

The trial justice believed that these sections pinpointed the responsibility on the contractor for affording to any motorist and his passenger some degree of reasonable protection as they make their way on a public highway which lies in the midst of rehabilitative efforts being made by some road builder. During the time the construction is going on, the state, through its employees, acts as a supervisor. Testimony by the state's resident bridge engineer and its resident road engineer made it clear that these two individuals were to oversee the contractor's work and to make sure that Campanella adhered to all of its contractual obligations not only to the state but also to persons such as the Gordons.

Traffic duty performed by officers of the Newport police department at the construction site is an extra-paid detail. The officer who was directing traffic at the time of the collision told the court and jury that as he took his position east of the bridge, "workers" were closing off the westbound lanes with those "barricade type of things." Newport's Director of Finance sent Campanella a weekly timesheet showing that this officer had worked on April 21, 1969 from 12:30 p.m. to 4:30 p.m. His afternoon pay was $14. The total amount of the bill sent Campanella for police services rendered in the project area for the week beginning April 20, 1969 amounted to $245. Campanella paid the bill.

In addition to commenting favorably upon the state's resident road engineer's assertion that Campanella was responsible for the safe passage of the motoring public, the trial justice alluded to the foreman of the painting crew. During the time he had worked on Bridge 908, this witness claimed that Campanella's personnel had set up

the barricades. The foreman also said that during the weeks he spent painting the six bridges, he had seen two-way-traffic-ahead signs "all over the job."

Campanella is concerned because the trial justice at no time expressly rejected the testimony offered by its bridge superintendent. However, we have repeatedly held that, in seeking to comply with the mandate of *Barbato,* a trial justice need not embark on a long dissertation of the evidence adduced at trial. *Molleur* v. *City Dairy, Inc.,* 110 R. I. 58, 290 A.2d 214 (1972). The trial justice's acceptance of the state's senior resident engineer constituted an implicit rejection of Campanella's star witness's contrary testimony. *State* v. *Correia,* 106 R. I. 655, 262 A.2d 619 (1970); *DiMaio* v. *Del Sesto,* 102 R. I. 116, 228 A.2d 861 (1967). It is quite apparent that the superintendent's preoccupation with bridge building had made him oblivious as to what was in the blue book and as to what was going on in the road gang. Parenthetically, in addition to the somewhat myopic and mistaken view that Campanella's bridge superintendent had of his employer's duty to the Gordons, the record shows that there was two-way traffic on a one-way portion of Admiral Kalbfus Road for almost three hours prior to the collision and that at no time did the contractor post a sign telling the eastbound traveler what he might encounter.

Try as it might Campanella has failed to persuade us that the trial justice erred in granting the new trial.

Campanella's third-party complaint is based on two grounds. There is an indemnity clause in its contract with the painter. The contractor also seeks contribution under the provisions of G. L. 1956 (1969 Reenactment) ch. 6 of title 10, the Uniform Contribution Among Tortfeasors Act. The indemnity clause reads as follows:

"The Sub-Contractor shall assume entire liability and shall indemnify and save the Contractor harm-

less against any and all claims for damage or injury of any kind or nature whatever to all persons, whether employees or otherwise, and to all property, resulting from the performance of the work provided for in this agreement * * *."

"Work" is defined in the contract as painting structural steel.

Where money is sought because of an indemnity provision in a contract, we have emphasized that such clause will be strictly construed against the indemnitee. *Dower* v. *Dower's Inc.*, 100 R. I. 510, 217 A.2d 437 (1966). It is obvious that the painter is bound to indemnify Campanella only for liability imposed on Campanella because of the painter's negligence. The Gordons' complaint did not arise because of the painter's lack of skill with its brushes but relates solely to Campanella's failure to alert the eastbound traffic. Campanella derives no benefit from the Uniform Contribution Among Tortfeasors Act because there is a complete absence of any evidence that Service Contracting did anything which contributed to the collision in the eastbound lanes.

The granting of the directed verdict was correct.

The defendant's appeal is denied and dismissed.

*Matthew Ward, John F. McDonough,* for plaintiffs.

*Hinckley, Allen, Salisbury & Parks, Ernest C. Torres,* for defendant Campanella Corporation.

*Jordan, Hanson & Curran, A. Lauriston Parks,* for Service Contracting, Inc., third-party defendant.