John H. FRENCH, II

v.

John T. ISHAM and Margaret Frazer

v.

C.A. PRETZER and C.A. Pretzer Associates, Inc.

v.

John H. FRENCH, II.

Civ. A. No. 89-0600 P.

United States District Court, D. Rhode Island.

Aug. 10, 1992.

---

Richard S. Humphrey, Tiverton, R.I., Thomas A. Butler, New York City, for plaintiff French.

Joseph T. Houlihan, Kathleen Managhan, Newport, R.I., for defendants Isham and Frazer.

Richard W. Petrocelli, Visconti & Petrocelli, Providence, R.I., for third party C.A. Pretzer and C.A. Pretzer Associates, Inc.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This case concerns a real estate transaction between the buyer-plaintiff, John H. French, II, and the sellers-defendants, John T. Isham and Margaret Frazer. The centerpiece of the lawsuit is a large Newport estate known as "Oakwood." Having purchased Oakwood, plaintiff has brought this action seeking damages for (1) defendants' alleged breach of an express warranty of

structural soundness, (2) defendants' alleged fraud for failure to permit complete inspection of a defective condition, and (3) defendants' fraudulent failure to disclose Oakwood's defective condition to the plaintiff prior to the sale.

## I. BACKGROUND

Following a period of negotiation, French entered into a purchase agreement to buy Oakwood from Isham and Frazer. The purchase and sale agreement was dated October 2, 1986. The closing took place on November 13, 1986; the ultimate purchase price was $1,750,000. In order to assess plaintiff's claims, however, one must plunge headfirst into the minute details of the transfer from beginning to end.

The pre-purchase agreement negotiations, conducted during the summer of 1986, were conducted between French and Isham's realtor, Mr. Robin Corbin. The original purchase price agreed upon was $1,800,000. In late summer, French hired C.A. Pretzer, an engineer, to inspect Oakwood. Pretzer inspected the premises on three separate occasions before submitting a written report of his findings to French on September 16, 1986. Pretzer's report noted two major problems:

(1) "an area of buckled plaster at the first landing at the main staircase which would have to be removed to see whether it has buckled because of age or because of some deterioration of the wood framing;" and

(2) severe "floor sag at the south wall of the master bedroom [for which] corrective action should be taken to level and strengthen this floor to prevent further settlement." Pretzer Report, Joint Ex. 4.

In response to Pretzer's report, French sent a letter dated October 14, 1986 to Mrs. Frazer (Joint Ex. 5), cataloguing the defects and proposing that the seller (Frazer) pay the first $50,000 to repair them, and that any amount in excess of $50,000 be split 50/50 between buyer and seller, with seller's liability to be capped at $200,000. The sellers rejected this offer, agreeing instead to an invasive inspection of the defects by Pretzer.

Pretzer conducted this invasive inspection on October 27, 1986. French was not present during the inspection. Several inspection holes were made with Isham's permission; however, plaintiff contends that one necessary hole was not permitted and was therefore never drilled. Pretzer found no structural defects in the course of this final inspection of Oakwood's main house. The parties subsequently negotiated the purchase price down to $1,750,000, presumably to compensate French for the defects listed in Pretzer's written report.

After the closing on November 13, 1986, French retained Carol Nelson, an architect, to oversee minor repair work and attic conversion in Oakwood's main house. While supervising the construction, Ms. Nelson noted that there was extensive sill rot to the walls of the main house. Following this discovery, French sought monetary compensation from Pretzer. French's lawsuit against Pretzer was ultimately settled; shortly thereafter, French initiated this suit against Isham and Frazer.

## II. BUYER'S RIGHT TO RELY ON SELLER'S WARRANTIES

■ The first question to be resolved is whether, given that plaintiff exercised his right to have an engineer inspect Oakwood on four separate occasions, he nonetheless had the right to rely on the structural soundness warranty contained in the purchase and sale agreement. Defendants contend that:

the language within the inspection provisions [of the purchase and sale agreement] together with the surrounding factual circumstances ... show that what the parties intended by these provisions was that, while Margaret Frazer was warranting the property, French was entitled to test her warranties by inspection and to alert her to any deficiencies, which deficiencies would allow him to withdraw from the agreement or to otherwise modify it. French understood that his remedy was not an absolute warranty which would survive the closing,

but rather the ability to make other arrangements if the inspection found deficiencies. The inspection gave him the right of avoidance of the agreement; he chose a reduction in purchase price instead.... By the time of the closing, Mr. French had a full opportunity to independently verify the accuracy of the seller's warranty. By the time of the closing, he was relying on his own engineer's report, not the seller's representation in the purchase and sale agreement. The warranty clause coupled with the right of inspection had already served their purpose.

Def. Post–Trial Brief at 14–15. Defendant's argument appears to be that, having exercised his right to inspect Oakwood, plaintiff may not now seek compensation for structural defects which his inspection failed to reveal.

This argument is unsupported in defendants' brief by any caselaw, nor could this Court locate any judicial precedent in support of defendants' position. *Casavant v. Campopiano*, 114 R.I. 24, 327 A.2d 831 (1974) is apparently the sole Rhode Island case to address this issue. In *Casavant*, home buyers brought suit against the builder-vendor for alleged breach of the implied warranty of habitability stemming from a defectively constructed roof. The court stated:

> The defendants argue that plaintiffs' inspection of the premises put plaintiffs on notice of the true condition of the house. It should be noted that plaintiffs had no access to the attic and, thus, even if they had the expertise to determine the quality of construction, they could not have done so. The defendants' argument here is wholly illusory.

*Id.* 327 A.2d at 834.

In the case now before the Court, plaintiff contends his engineer was denied the ability to perform a complete inspection. According to defendants, plaintiff's engineer sought to make a hole which would be costly to repair, and defendants stated they would permit the hole if plaintiff agreed to pay for its repair if he chose not to purchase Oakwood. Regardless of whose version of the facts the Court adopts, it would be nonsensical to deny the plaintiff his right to rely on defendants' express warranties simply because he exercised his right to inspect the property. Such a ruling would have the undesirable effect of discouraging buyers from becoming well-informed; a purposefully ignorant purchaser would retain a cause of action for breach of warranty, while a buyer who made efforts to acquire as much information about his purchase as possible would consequently have no remedy for the seller's breach. Accordingly, I find that, if French has a viable claim against Isham and Frazer for breach of warranty, that claim is no less viable simply because he exercised his right to inspect Oakwood prior to the closing.

### III. THE STRUCTURAL WARRANTY CONTAINED IN THE PURCHASE AND SALE AGREEMENT MERGED IN THE DEED AND THUS BECAME VOID

The outcome of this case depends in large part on the application of the "merger" doctrine to its facts. The merger doctrine dictates that

> a warranty deed, once accepted, becomes the final statement of the agreement between the parties and nullifies all provisions of the purchase-and-sale agreement. *Russo v. Cedrone*, 118 R.I. 549, 557, 375 A.2d 906, 910 (1977). Absent a demonstration of fraud or misrepresentation, the warranty deed is the final embodiment of the agreement and conveys full rights to the property. *Id.* at 557–58, 375 A.2d at 910.

*Deschane v. Greene*, 495 A.2d 227, 229 (R.I.1985).

There are several exceptions to the merger doctrine. The exception most relevant to this case applies to collateral agreements, wherein the parties intend the deed to represent only partial execution of the contract. 77 Am.Jur.2d *Vendor and Purchaser* § 291 (1975) ("The rule that the acceptance of a deed tendered in the performance of a contract to convey land merges or extinguishes the covenants and stipulations contained in the contract does

not apply to those provisions of the antecedent contract which the parties do not intend to be incorporated in the deed, or which are not necessarily performed or satisfied by the execution and delivery of the stipulated conveyance."). For example, "stipulations for the performance of acts in the future, such as a stipulation for the making of repairs or improvements, are not merged in the deed." *Id.* *See also Biehl v. Atwood*, 151 Ill.App.3d 763, 104 Ill.Dec. 574, 575, 502 N.E.2d 1234, 1235 (1986) ("If there are provisions in the contract which delivery of the deed does not fulfill, the contract is not merged in the deed and remains open for performance of such terms.")

■ The contracting parties' intent is essential for determining whether merger applies to a given real estate transaction. *See, e.g., Mallin v. Good*, 93 Ill.App.3d 843, 49 Ill.Dec. 168, 170, 417 N.E.2d 858, 860 (1981) ("Whether and to what extent the contract merges into the deed is also a matter of the intention of the parties as evidenced by the language of their agreement and the surrounding circumstances."). With this in mind, the Court turns its attention to the following question in order to divine whether merger applies to the instant case: Is the warranty of structural soundness contained in the purchase-and-sale agreement collateral and therefore not merged?

## A. COLLATERAL AGREEMENTS AND MERGER: THE LAW IN OTHER JURISDICTIONS

This is a question of first impression in this jurisdiction, since there appears to be no Rhode Island law on point. In seeking to determine whether structural soundness warranties are collateral, I will first look to the law of other jurisdictions. I note initially, however, that few state courts in any jurisdiction have addressed this precise question.

In *Mallin v. Good*, 49 Ill.Dec. at 168, 417 N.E.2d at 858, an Illinois court was faced with a contract for the sale of residential real estate. The contract at issue included covenants to the effect that (1) the vendor would repair the roof of the home, and (2) that the plumbing and other equipment would be in reasonable working order at the time of closing. The court noted that, "while no Illinois reviewing court has considered the specific question of whether a vendor's covenant to make repairs will be merged into the subsequent deed, the weight of authority in other jurisdictions is that such agreements are collateral to the deed and are not merged into it." *Id.* at 170, 417 N.E.2d at 860 (citations omitted). Explaining that both covenants were collateral and did not merge, the court stated,

Delivery of the deed would not constitute performance of th[ese] portion[s] of the contract as [they were] incidental to the main purpose of the contract, that is, the conveyance of real estate.... [These contractual obligations were] not performed by the delivery of the deed. In fact, defendant could not be in breach of this provision until the closing as she had until that time to comply with it.

*Id.* at 171, 417 N.E.2d at 861.

In *Rouse v. Brooks*, 66 Ill.App.3d 107, 22 Ill.Dec. 858, 383 N.E.2d 666 (1978), an Illinois court once more faced a novel, though related, question concerning collateral agreements and merger. The issue in *Rouse* was whether merger applies to an express quality warranty made by a seller of a previously-owned home as part of the sales contract. (The warranty stated that the property was, in all aspects, "in good, proper, satisfactory and functional working order and condition." *Id.* 22 Ill.Dec. at 859, 383 N.E.2d at 667.) In holding that the express warranties were collateral and thus did not merge with the deed, the court opined:

We believe the better rule to be that quality warranties are independent of and collateral to the conveyance of title and, therefore, are not satisfied by the acceptance of the deed. Most of the provisions in a land sales contract deal with the mechanics and requirements of conveyancing which the deed conclusively settles. Warranties as to quality, in comparison, touch upon aspects other than the conveyance itself and are inci-

dental to the main purpose of the deed, which is to transfer good title. Accordingly, we hold that these warranty provisions in the purchase agreement do not merge in the deed.

*Id.* at 860, 383 N.E.2d at 668.

Closer to home, in *Solomon v. Birger*, 19 Mass.App. 634, 477 N.E.2d 137 (1985), a Massachusetts court evaluated a real estate purchase agreement which included an express warranty that the house was free of major structural defects. In addition, the agreement contained the following merger provision: "The acceptance of a deed by the Buyer or his nominee as the case may be, shall be deemed to be full performance and discharge of every agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed." *Id.* 477 N.E.2d at 143. In holding that all provisions of the purchase agreement merged in the deed, the court relied only partially on the unequivocal language of the merger provision. To support its view, the court also compared the facts of *Solomon* to those of previous cases in which purchase agreement provisions were held to be collateral. In each of the earlier cases the court discussed,

> there was a separate agreement to construct or repair a building upon the premises to be conveyed. In those circumstances it was plausible to reason that the obligation to build was collateral to the undertaking to convey. It was also reasonable to suppose that a purchaser from a builder-vendor would rely on the contractor's possessing the skill to build a house which is habitable.

*Id.* at 143. By contrast,

> In the case now before us there is no undertaking collateral to conveyance of the premises. The seller had no obligation to fix anything, to remove anything, or to add something. Nothing needed doing if the buyers decided, after investigation, that the conditions of conveyance had been met.

*Id.* Finally, in addressing the issue of the contracting parties' intent, the court noted, "It is difficult to imagine that an agreement designed by a real estate association would contain a twenty-year warranty about a fact of which the seller is likely to have imperfect knowledge, i.e., whether his structure, at the time of sale, conforms in every respect with the building code." *Id.*

## B. THE WARRANTY IN THIS CASE DOES NOT REPRESENT A COLLATERAL AGREEMENT

■ I turn now to the facts of the instant case. The purchase and sale agreement signed by the parties states in Paragraph 4, "Seller warrants the structural soundness of the improvements on the Premises and the good working order of all plumbing, electrical, fire, and burglar alarm systems and further warrants that they shall be in good and proper working condition at the time of closing." Joint Ex. 1. The deed contained no such warranty.

■ Based on the above caselaw as well as on public policy concerns, this Court finds that the structural soundness warranty at issue merged with the deed. Sound public policy would dictate that *specific* warranties as to quality (to be distinguished from those related to title) are collateral and thus do not merge. Specific quality warranties are typified by the seller's warranty of a leak-free roof in *Vellaringattu v. Caso*, 144 Misc.2d 519, 544 N.Y.S.2d 455, 457–58 (D. Nassau Co.1989) (cited in Pltf's Post–Trial Brief at 18). By analogy, warranties or contractual promises to the effect that some specified defect will be repaired are also collateral and do not merge.

However, this Court declines to hold that a general warranty of structural soundness is collateral; such a holding "would impose an insurmountable burden for the seller of a one hundred year old house to warrant its construction." Def' Post–Trial Brief at 12. A collateral agreement must be just that—collateral. It must concern some aspect of the sale of the house that is not within the general mine run of house sales. The structural soundness warranty at issue here simply does not distinguishes itself as collateral. If such sweeping warranties as this are not extinguished by merger when

the deed passes, even the most honest, forthright sellers will remain potentially vulnerable to lawsuits years after their real estate transaction has closed. This result is unjust, and this Court will not now impose such a harsh rule on real estate vendors in Rhode Island.

### IV. THE PARTIES' INTENT RE: MERGER

■ There is another reason why I feel my decision in this case rests on sound legal principle. Much of the three-day trial of this case focused on the parties' intent; unsurprisingly, plaintiff attempted to show that the warranties were intended to survive the closing, while defendant tried to paint a strikingly different picture. As shall be detailed below, I find that the parties' intent, as demonstrated by their words and actions before the transaction was "a done deal," demonstrated mutual understanding that the structural soundness warranty was to merge in the deed.

In reaching my conclusion, I rely principally on three pieces of evidence as to the parties' intent: the October 14, 1986 letter from French to Frazer (Joint Ex. 5), the $50,000 downward price adjustment for the property, and the buyer's inspection of Oakwood.[1] I will address the implications of each piece of evidence in turn.

### A. THE OCTOBER 14 LETTER FROM FRENCH TO FRAZER

French's October 14, 1986 letter to Frazer proposed that plaintiff be financially responsible for "all expenses to correct the problems mentioned in (sic) engineers' report other than" four specifically enumerated problems, including the cost of repair for the sagging floor in the bedroom/ceiling in the living room.[2] The four enumerated repairs, French suggested, should be paid for as follows: the first $50,000 would be paid by the sellers, and all costs in excess of $50,000 would be split 50/50 between buyer and sellers, with sellers' liability not to exceed $200,000.

Plaintiff argues he made this offer to defendants simply because he wanted to move into Oakwood "right away," and thus wanted to resolve the issue of repair costs as quickly as possible. He further contends, "The offer [extended in his October 14 letter] envisioned that Frazer would be responsible for a substantial portion of the cost of repairing the known defects. The letter has nothing to do with the warranty of structural soundness." Pltf's Post–Trial Reply Brief at 10. Defendants disagree: "French made the offer of October 14, and Frazer rejected it because both parties knew that there was no seller's warranty which would survive the closing." Defs' Post–Trial Brief at 17.

Defendants' interpretation of French's intent in writing the October 14 letter is simply more plausible than French's explanation for the letter. I share defendants' skepticism concerning plaintiff's motives:

If, as French now claims, he understood that the language of the purchase and sale agreement already made the seller responsible for the entire cost of repairs, why would he propose a half and half sharing of those same costs? If the purchase and sale agreement, which had been signed two weeks earlier, placed no limit on the seller's liability for repairs, why would French propose to cap the seller's liability at $200,000.00?

Of course, if the Plaintiff's understanding of the purchase and sale agreement was in October of 1986 as he now claims it to be, he would never have written the October 14th letter. That letter only makes sense as an attempt by the buyer to obtain from the seller a

---

**1.** The Court's Opinion does not rely on any of the evidence whose admissibility was left unresolved at trial. I rely neither on Pretzer's deposition testimony in *French v. Pretzer* to the effect that French told him the house was purchased "as is;" nor on the memo Pretzer allegedly made to his file regarding a telephone conversation with French about the "as is" purchase (see Defs' Post–Trial Brief App. at 3); nor on the first draft of the purchase and sale agreement which

plaintiff offered as a trial exhibit. Since none of this evidence was necessary for me to reach my determination in this case, I need not rule on its admissibility.

**2.** The sag in the bedroom floor is at the heart of this dispute; this is the structural defect upon which plaintiff's complaint is predicated.

financial contribution to the cost of repairing the property, a contribution which the seller had no prior obligation to make. Certainly, French would not have written a letter to Mrs. Frazer suggesting that her financial responsibility to pay the cost of needed repairs be substantially reduced. Mr. French's letter of October 14, 1986 is the best evidence of his understanding of the obligations of the parties under the agreement signed two weeks earlier. It strongly shows his understanding that the seller was *not* obligated to pay for repairing defects in Oakwood.

Defs' Post–Trial Reply Brief at 4–5.

Plaintiff's argument that the provisions of his letter were not meant to apply to undisclosed defects is misleading. The letter categorically states it applies to the sagging bedroom floor, which is the very defect for which plaintiff now seeks compensation. True, the *cause* of the defect (i.e., inadequate steel beam support) was unknown, but the defect itself—the sag in the floor—*was* known, and French clearly intended its repair to be covered by the terms spelled out in his October 14 letter.

## B. THE $50,000 PRICE REDUCTION

According to plaintiff, the price adjustment from $1,800,000 to $1,750,000 was intended to cover only a short list of previously identified defects, not unknown defects which might be discovered in the future. Plaintiff alleges, "[T]here is absolutely no evidence to indicate that the price adjustment related to unknown structural defects and that the parties intended to settle a breach of the structural warranty claim as part of the price adjustment." Pltf's Post–Trial Reply Brief at 8.

However, the $50,000 price reduction was negotiated only *after* plaintiff proposed a formula by which the parties might share financial liability for defects in the house (see subsection (a) above). After defendants rejected plaintiff's offer, the parties negotiated the purchase price downward. The most reasonable interpretation of this chronology of events is that the $50,000 reduction represented an alternative arrangement (ultimately accepted by both sides) by which said defects could be repaired and those repairs equitably financed. If this were not so, French would have further pursued his original offer, perhaps with modifications, so that defendants would remain liable for part of the cost of repairing the defects. French made no such efforts once the purchase price was dropped; evidently, the reduction quelled his concerns about unpredictable repair costs (including, as his letter unequivocally states, those costs associated with repairing the sagging bedroom floor).

## C. THE BUYER'S INSPECTION OF OAKWOOD

As discussed in Section II of this Opinion, the plaintiff-buyer's inspection of Oakwood did not, without more, extinguish his right to rely on sellers' warranties. However, the fact that French's engineer conducted a thorough inspection consisting of four separate visits to Oakwood—including one invasive demolition inspection—does provide some insight into plaintiff's understanding of the warranties. French was clearly concerned with becoming fully informed as to the defects in the house. One could logically assume that he would have been less concerned had he thought his right to rely on sellers' warranties would never cease.

The Court finds it difficult to accept French's putative explanation for the inspection:

While the purpose of the warranty was to ensure that Mr. French was acquiring a house that was structural (sic) sound, the purpose of the inspection provision was to enable Mr. French to learn if the premises were in "move-in condition," and if there was (sic) to be any repairs how much time it would require to make these repairs and at what cost.... A visual inspection would not necessarily detect a structural defect. The visual inspection was supposed to enable Mr. French to determine how soon after the closing he would be able to move his family into the house.

Pltf's Post–Trial Reply Brief at 5. A mere one page later in his Reply Brief, plaintiff

himself characterizes the inspection provision of the purchase and sale agreement as "the usual right of inspection." Pltf's Post–Trial Reply Brief at 6. To this Court's knowledge, the usual right of inspection is designed not so that the buyer knows when he can occupy the house, but so that the parties can be fully informed before closing a real estate deal. Clearly, French was aware that inspection serves a much broader purpose than that which he claims his inspection had, since a result of the inspection was a $50,000 reduction in the purchase price.

My analysis may seem contradictory to what I stated in Section II above, but in reality the two sections are entirely consistent. By exercising his right of inspection, French did not "give up" whatever right he had to rely on sellers' warranties; a buyer's inspection does not, by itself, justify extinction of his right to rely on seller's warranties throughout the period when those warranties would otherwise remain effective. However, the facts surrounding French's inspection of Oakwood do shed light on his intent and understanding with respect to the duration of the structural soundness warranty. His painstaking efforts to conduct an exhaustive inspection, in conjunction with the other facts discussed in this section, lead me to believe French understood that the sellers' warranties, set forth in the purchase and sale agreement, merged in the deed. Thus, the parties' mutual intent and understanding, as well as this Court's interpretation of the law regarding collateral agreements and merger, lead me to conclude that the structural soundness warranty contained in the purchase and sale agreement merged with the deed and became void.

## V. PLAINTIFF'S FRAUD CLAIMS

Plaintiff alleges three distinct fraud claims: a claim for fraudulent misrepresentation, a claim for fraudulent concealment, and a claim for negligent misrepresentation. Each of these claims, like his breach of warranty claim, is unavailing.

## A. THE LAW OF FRAUDULENT MISREPRESENTATION

Liability for fraudulent misrepresentation arises where

[o]ne who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts § 525 (1976).

A misrepresentation is fraudulent if the maker

(a) knows or believes that the matter is not as he represents it to be,

(b) does not have the confidence in the accuracy of his representation that he states or implies, or

(c) knows that he does not have the basis for his representation that he states or implies.

*Id.* at § 526. *See also B.S. Intern. Ltd. v. Licht,* 696 F.Supp. 813, 827 (D.R.I.1988); *McGovern v. Crossley,* 477 A.2d 101 (R.I. 1984). The defrauded party must have justifiably relied on the fraudulent misrepresentation. Restatement (Second) of Torts at § 537.

Perhaps most relevant to the case at bar is § 547 of the Restatement, instructing that no liability arises where one decides to enter into a transaction based on an independent investigation. There is no liability for fraud in such a situation unless the defrauding party "by false statements or otherwise intentionally prevents the investigation from being effective." *Id.*

Thus one who has fully inspected a house before buying it ordinarily cannot claim that he was deceived by a misrepresentation of the condition of the ceilings that was apparent to any one taking the trouble to look at them.... On the other hand, if the condition is a latent one, which the inspection or investigation could not reasonably be expected to discover, the recipient may still be relying upon the representation as well as the investigation....

Even though the recipient is found to act or to refrain from action in reliance only upon his own investigation, the maker of the fraudulent misrepresentation may still be liable if he intentionally frustrates the investigation. When he makes it ineffective by false statements, by misdirection, concealment or other trickery, his original misrepresentation carries through, and he cannot be heard to say that the recipient has relied upon an inquiry that has come to nothing through his own machinations. It is by reason of his conduct that the recipient has been induced to surrender his judgment in reliance upon a frustrated investigation originally set in motion by reason of the misrepresentation.

*Id.* at § 547 cmt. (1) & (2).

## B. THE LAW OF FRAUDULENT CONCEALMENT

Liability for fraudulent concealment arises where

> [o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

Restatement (Second) of Torts § 550. Comment (b) of the Restatement indicates that this tort is committed, for example, "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation."

## C. THE LAW OF NEGLIGENT MISREPRESENTATION

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552.

## D. PLAINTIFF HAS NOT PROVEN THE ELEMENTS OF FRAUD

All three of plaintiff's fraud claims are based on the following alleged facts: that Isham knew that Mr. French was not going to purchase Oakwood unless Pretzer was free to make inspection holes to ascertain the reason for a bulge in the stairwell and the sag in the bedroom; that Isham consented to an inspection by Pretzer which involved making holes; that the inspection took place on October 27, 1986; and that Isham would not permit Pretzer to make a hole so that he, Pretzer, could determine the support for a substantial steel beam which they located in the ceiling of the living room. Pltf's Post-Trial Brief at 10–11 (citations omitted). These facts, even assuming they are entirely true, fail to prove fraudulent conduct by the defendants.

The facts adduced at trial simply do not support plaintiff's fraud claims. The parties agree that during the fourth invasive inspection of Oakwood, Pretzer sought permission to make a hole to investigate the source of support for a steel beam. The parties further agree that Isham refused Pretzer's request. Plaintiff contends Isham's refusal was unequivocal, while defendants maintain that Isham was willing to have the hole made, provided French agreed to pay for its repair if he decided not to purchase the house. To prevail on his fraud claims, plaintiff needed to convince the Court that his version of these events—and not that of the defendants— was the truth. This he did not do. This weakness in plaintiff's argument is fatal; his fraud claims survive only if defendants unconditionally refused to allow him to fully inspect the house. If plaintiff's failure to fully inspect the premises arose from his own frugality and not from defendants' deceit, he has no one to blame but himself.

Moreover, while French was not present during the invasive inspection, he relied on

on his agent, Pretzer, to relay the results of that inspection to him. Following the inspection, Pretzer spoke with French about its outcome, a conversation undoubtedly foreseen by defendants. In fact, French testified that following the inspection, Corbin instructed him that "there were a couple of minor technicalities that I [French] should check with Mr. Pretzer on." Trial Transcript, 1/08/92 at 24. From this, it is clear defendants assumed plaintiff would speak with his own agent regarding the inspection; indeed, they even went so far as to alert plaintiff to problems he should discuss with Pretzer.

French's testimony regarding the conversation he had with Pretzer after the inspection seals the fate of the fraud claims. In response to the question "What did Mr. Pretzer advise you [concerning the outcome of the invasive inspection]?" French stated, "Mr. Pretzer advised me that there was a steel beam that seemed to be sufficient weight bearing and so forth and that it was undoubtedly on steel posts and everything seemed to be all right and he seemed to be generally satisfied." Trial Transcript, 1/08/92 at 26.

French's own agent told him the property was sound and did not mention any frustration of inspection by defendants. This testimony belies plaintiff's allegations of fraud. Defendants do not bear responsibility for Pretzer's alleged failure to notify French that the steel beam's source of support had not been identified. It was Pretzer's responsibility to tell French whether the inspection was satisfactorily completed, not Isham's or Corbin's.

■ I find nothing in the record to suggest that defendants intentionally misled plaintiff as to the outcome of the inspection. Thus, both the claims of fraudulent misrepresentation and fraudulent concealment must fail. Nor do I find that defendants failed to exercise reasonable care in communicating the results of the inspection to French; accordingly, defendants are not liable for negligent misrepresentation.

## VI. THE THIRD–PARTY DEFENDANTS

In their defense of this action, defendants Isham and Frazer claimed they were entitled to indemnification and contribution from third-party defendants, C.A. Pretzer and Pretzer Associates ("Pretzer"). However, since the Court has found that Isham and Frazer are not liable to the plaintiff for breach of warranty or for fraud, the issue of Isham and Frazer's right to indemnification from Pretzer is moot.

■ One issue remains, however, with respect to the third-party defendant. Pretzer claims he is entitled to indemnification and contribution from French for attorneys' fees arising from Pretzer's defense of this action. Pretzer's claim relies on the Release he obtained from French in the settlement of *French v. Pretzer.* Under the terms of the Release, French agreed to "indemnify and forever hold harmless [Pretzer] against all loss and damage because of any and all further claims, damages or actions made by others on account or in any manner relating from said lawsuits and damages."

Pretzer argues that the phrase "all loss and damage" in the Release encompasses attorneys' fees; French disagrees and contends that the Release must *specifically* provide for indemnification of attorneys' fees for liability to attach. Pretzer offers little argument or caselaw to support his position. He states:

Obviously, even if Pretzer receives a favorable judgement against the third-party complaint, he will have suffered substantial financial "loss" and "damage" in the form of attorneys' fees and costs. There is no limitation in the very general and broad language of the release requiring French to reimburse Pretzer from all "loss" or "damage." The agreement does not exclude attorneys' fees or court costs as elements of "loss" or "damage." When the language of a release is clear and unambiguous, its application presents an issue of law. *Lennon v. McGregor,* 423 A.2d 820, 822 (R.I.1980). There can be no dispute that Pretzer suffered a monetary "loss" as a result of the third-

party action in the form of attorneys' fees and costs of defending the action.

Pretzer's Post–Trial Brief at 9.

A review of relevant caselaw leads to the conclusion that Pretzer is not entitled to indemnification for attorneys' fees. It is well settled that indemnity provisions are to be strictly construed against the party alleging a right to indemnification. *Muldowney v. Weatherking Products, Inc.,* 509 A.2d 441, 443 (R.I.1986). *See also Gordon v. Campanella Corp.,* 112 R.I. 417, 311 A.2d 844, 849–50 (1973) (citations omitted) ("Where money is sought because of an indemnity provision in a contract, we have emphasized that such clause will be strictly construed against the indemnitee."); *Dower v. Dower's Inc.,* 100 R.I. 510, 217 A.2d 437, 438–39 (1966) ("Following the rule that indemnity provisions must be strictly construed against the indemnitee, the courts in most of the states have refused to draw inferences from words of general import found in the apparently all-inclusive and catchall language of a general indemnity provision.").

French's analysis of Pretzer's claim is wholly accurate:

> The indemnity provision in the Release does not refer to attorneys' fees, litigation expenses or court costs. Absent such specificity, the Release must be construed against Pretzer to exclude such items. There is no basis, therefore, to award attorneys' fees to Pretzer.

Pltf's Post–Trial Reply Brief at 22. A strict construction of the phrase "all loss and damage" does not permit me to read "including attorneys' fees" into the phrase. Had Pretzer and French intended Pretzer to be indemnified for attorneys' fees and court costs, they could easily have written the Release to read, "Pretzer is hereby indemnified against all loss and damage, *including attorneys' fees and related litigation expenses ...*" However, it is not within the province of the Court to retroactively reformulate the terms of the parties' Release; accordingly, Pretzer's claim for indemnification from French for attorneys' fees is denied.

## VII. DEFENDANTS' COUNTERCLAIM RE: CLOCKTOWER REPAIR

When French began negotiating the purchase of Oakwood with Isham and Corbin, he was told that only the main house was for sale, since Frazer wished to continue living on the premises in a smaller building known as the "Clocktower." Eventually, the parties agreed that French could purchase the entire premises, provided he leased the Clocktower back to Frazer for the remainder of her life. Under the terms of the lease, the landlord (French) agreed "to keep the outside and all exterior appurtenances, and the structure of the building on the Premises in sound condition and good repair." Joint Ex. 3 at 5.

Based on this provision of the Lease, defendants counterclaimed against French for the cost of exterior repairs to the Clocktower. Defendants devote less than one page of their Post–Trial Brief to this counterclaim, and plaintiff's post-trial papers are completely devoid of any discussion or counterargument on the subject. In addition to the Lease itself, two related exhibits were introduced at trial: Joint Exhibit 6, a letter from Frazer to French alerting him that the exterior of the Clocktower was in need of repair; and Joint Exhibit 7, the letter French wrote in response, informing Frazer "Given the condition Oakwood really was in, I am not prepared to undertake another possibly extensive and expensive repair of the Clocktower."

I do not have a sufficient basis to rule on defendants' counterclaim against French. If, under the terms of the Lease, French is responsible for the cost of certain repairs, he obviously cannot refuse to pay those costs as a "set off" against the costs he incurred in repairing Oakwood. However, this Court cannot divine whether the unspecified exterior repairs alluded to in Frazer's letter fall within the ambit of the lease provision quoted above. This counterclaim appears to have been a hasty afterthought on defendants' part, and plaintiff has apparently given it no thought at all. Accordingly, defendants' counterclaim against French is dismissed without preju-

dice; the Court urges the parties to resolve this issue informally.

### VIII. CONCLUSION

Defendants Frazer and Isham are not liable to plaintiff French for breach of warranty, fraudulent misrepresentation, fraudulent concealment, or negligent misrepresentation. The third-party defendant's claim for indemnification and contribution from defendants Frazer and Isham is moot; accordingly, this claim is passed. The third-party defendant's claim for indemnification and contribution from plaintiff French for attorneys' fees is denied. Defendant Frazer and Isham's counterclaim against French for the cost of repairs to the Clocktower is dismissed without prejudice.

SO ORDERED.