DECISION
Before the Court for decision is (i) Plaintiffs' Peter J. Sangermano, Jr. ("Mr. Sangermano"), individually and in his capacity as the Director of Sanat Properties, LP ("Sanat"), [1][2] Motion for Partial Summary Judgment on the issue of liability[3] against the Defendant, Roger Williams Realty Corporation ("Realty" or "Defendant"), and (ii) Realty's Cross Motion for Summary Judgment as to the same issue, pursuant to Super. R. Civ. P. 56. Specifically, by virtue of their multi-count Complaint, the Plaintiffs seek indemnification from Realty for the attorneys' fees and litigation expenses that Mr. Sangermano incurred as a result of his federal indictment and *Page 2 
subsequent trial in connection with former Rhode Island State Senator John Celona's ("Mr. Celona") contract with the Village at Elmhurst ("the Village") to perform consulting services.[4] See Compl. The Plaintiffs affirm that despite express promises to Mr. Sangermano and the Village regarding indemnification — including a contract in which Realty explicitly agrees to indemnify the Village for "any additional costs or expense associated with Celona's engagement as a consultant"[5] — Realty refuses to indemnity Mr. Sangermano for his attorneys' fees and litigation expenses. The Plaintiffs also assert that Realty's refusal to indemnify constitutes a breach of contractual obligations governing the relationship between Mr. Sangermano, Sangermano Realty, Inc. ("Sangermano Realty"), Sanat, the Village, and Realty.[6] Further, the Plaintiffs claim that as a result of the express and equitable indemnification obligations flowing from this *Page 3 
contractual arrangement — in which Mr. Sangermano is entitled to indemnification from Sangermano Realty, Sangermano Realty is entitled to indemnification from Sanat, and Sanat is entitled to indemnification from the Village — Realty's breach directly harms Mr. Sangermano individually, as well as the Village. Id. Accordingly, the Plaintiffs assert that no genuine issues of material fact exist with respect to Realty's obligation to indemnify the Plaintiffs, and, therefore, the Plaintiffs are entitled to summary judgment on the issue of liability.
In response, Realty maintains that the Plaintiffs cannot establish the existence of an enforceable agreement with Realty that specifically covers indemnification of attorneys' fees and litigation expenses. Consequently, Realty avers that the Plaintiffs' claims fail as a matter of law; and the Court should thus grant Realty's cross motion for summary judgment on the issue of liability.
 I Facts and Travel
On January 5, 2006, Mr. Sangermano — along with the Roger Williams Medical Center ("Medical Center")[7]; Robert Urciuoli ("Mr. Urciuoli"), the former President and Chief Executive Officer of the Medical Center and former President of Realty; and Frances Driscoll ("Ms. Driscoll"), the former Senior Vice President, External Affairs, Corporate Communications and Development for the Medical Center — were indicted by a federal grand jury in the State of Rhode Island. (Pls. ['] Ex. 1, Federal Indictment ¶ 1-4.) Specifically, the indictment charged Mr. Sangermano and the others with conspiring to commit, and the commission of, substantive violations of the federal mail fraud statute, *Page 4 
incident to a scheme to defraud the State of Rhode Island and its citizenry of the honest services of former State Senator Celona, arising from Mr. Celona's Consulting Agreement with the Village. See
Compl. ¶ 34. Subsequently, on October 13, 2006, following a three-week trial in the United States District Court for the District of Rhode Island, Mr. Sangermano was acquitted by a jury on all counts.Id. ¶ 35.
In connection with the indictment and subsequent defense at trial, Mr. Sangermano has allegedly incurred approximately $1,682,461.52 to date in attorneys' fees and litigation expenses. Id. ¶ 36. Mr. Sangermano has previously attempted to recoup these significant legal expenses from Realty, but Realty has refused to oblige, claiming that it does not have a legal obligation to indemnify Mr. Sangermano for his attorneys' fees and litigation expenses. Id. ¶ 38-39. Essentially, Mr. Sangermano's indictment, trial defense, and present claims for indemnification are all directly or indirectly related to the Consulting Agreement entered into between Mr. Celona and the Village. Thus, it is the facts surrounding the creation of the Consulting Agreement and subsequent retention of Mr. Celona that are of particular importance in determining the validity of the Plaintiffs' claims against Realty for indemnification. Against this backdrop, the critical facts regarding the hiring of Mr. Celona and the creation of the Consulting Agreement between Realty and the Village are presented herein.
In the spring of 1996, Realty[8] entered into a joint venture with Sanat[9] to construct and develop the Village, an assisted living facility located on Smith Street in Providence, *Page 5 
Rhode Island.The joint venture called for Realty to contribute property worth approximately $1.1 million, while Sanat employed its expertise in building independent assisted care facilities to finance, construct, and operate the actual facility. (Pls. ['] Ex. 13, Trial Tr. 7-8.)Pursuant to the joint venture agreement, Realty and Sanat became equal partners, each owning a 50% interest in the Village. (Def. ['s] Ex. 1, Sangermano Grand Jury Test. 7.) The Village Operating Agreement outlined the essential terms and conditions governing the operation of the facility, including the following indemnification provision:
 To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Member [members consisting of (1) Realty — 50% ownership — and (2) Sanat — 50% ownership] from and against any and all losses, claims, damages, liabilities or expenses of whatever nature, as incurred, arising out of or relating to the fact that such party was or is a Member of the Company. (Pls. ['] Ex. 7, the Village Operating Agreement, Article VI, § 6.7) (emphasis added.).
Sometime in or about August of 1997, Mr. Celona reached out to the Medical Center's then-President and CEO, Mr. Urciuoli, to inquire about potential employment opportunities with the Medical Center. (Pls. ['] Ex. 1, Federal Indictment, ¶ 21.) Shortly after his conversation(s) with Mr. Celona, Mr. Urciuoli broached the subject of possibly hiring Mr. Celona with Ms. Driscoll and expressed his interest in employing Mr. Celona as a consultant for the Medical Center. Id. ¶ 22. After much debate, it was finally decided by Mr. Urciuoli that Mr. Celona's skills as a potential liaison to the elderly community served by the Medical Center and its affiliates would best be applied to the operations conducted on the Medical Center's north campus, which contained Phase I of the Village and the Elmhurst Extended Care Nursing Home. As discussed previously, *Page 6 
Realty, an affiliate of the Medical Center, had a 50% ownership interest in the Village. (Compl. ¶ 10.) However, in order to officially retain Mr. Celona as a consultant for the Village, Mr. Urciuoli presumably needed the support of Sanat, the entity holding the remaining 50% ownership interest in the Village. See id. As a result, sometime in late 1997 or early 1998, Mr. Urciuoli — on behalf of Realty — initiated discussions with Mr. Sangermano — the designated representative of Sanat and manager of the Village — about hiring Mr. Celona as a consultant for the Village. See id. ¶ 14.
When Mr. Urciuoli initially approached Mr. Sangermano regarding the hiring of Mr. Celona as a consultant for the Village, Mr. Sangermano was apprehensive about agreeing to such a deal. See Pls. ['] Ex. 13, Trial Test. 13-15. Mr. Sangermano was concerned about superfluous expenses and believed he had already put together a quality marketing group that adequately promoted all of his assisted living developments. In short, he did not see the need to engage Mr. Celona's services as a consultant. Nevertheless, despite Mr. Sangermano's trepidation, Realty and the Village began negotiating a consulting agreement whereby Mr. Celona would provide consulting services for the Village by "heighten[ing] awareness among seniors (the elderly) of the greater Providence community as to the programs and services available at the Village at Elmhurst, and Elmhurst Extended Care." (Compl. ¶ 15.) Mr. Sangermano, upon the advice of counsel, demanded the following assurances from Realty before officially signing off on the Consulting Agreement on behalf of the Village: (1) a statement evidencing the fact that Mr. Celona had been retained at the request of Realty, (2) that Mr. Celona's consulting fees would be paid out of Realty's share of the profits from the Village, (3) a promise from Realty to indemnify the Village for any costs or expenses *Page 7 
associated with Mr. Celona's engagement as a consultant to the Village, and (4) that the Ethics Commission issue an advisory opinion regarding the appropriateness of engaging Mr. Celona as a consultant.See Pls. ['] Ex. 13, Trial Tr. 16-19.
In response to these requests, two important events transpired. First, to make certain that Realty would be officially accountable for the payments to Mr. Celona, Realty and Sanat executed a modification to the Village Operating Agreement. See Def. ['s] Ex. 3, Celona Modification. The modification ensured that all deductions for payments by the Village to Mr. Celona in his capacity as a consultant would be allocated and debited to Realty's capital account. Id. In particular, the specific modification to the Village Operating Agreement reads as follows:
 Reference is hereby made to that certain Village at Elmhurst, LLC, Operating Agreement, dated as of May 1, 1996, (the) ("Agreement"). Capitalized terms used herein and not otherwise defined shall have the same meaning as in the Agreement.
 For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned, being all of the members of the Company, hereby agree as follows, which agreements shall constitute amendments to the Agreement:
 (1) Section 10.4 of the Operating Agreement is hereby amended by adding thereto the following:
 M. All deductions for payments by the Company to John Celona, a health care consultant for seniors, shall be specially allocated and debited to the Capital Account of Roger Williams Realty Corporation. Id.
In addition to the modification to the Village Operating Agreement, Mr. Urciuoli, as the then-President of Realty, sent a confirmation letter ("Indemnification Letter") on June 17, 1998 to Mr. Sangermano as Manager of the Village regarding Mr. Celona's *Page 8 
engagement as a consultant for the Village. (Compl. ¶ 17.) The letter confirmed that, in addition to covering all of the consulting expenses, Realty also agreed to indemnify the Village for "any additional costs or expense associated with Celona's engagement as a consultant."Id. Specifically, the Indemnification Letter provides that:
 This will confirm that Roger Williams Realty Corporation ("Realty") requested that you engage John Celona as a consultant pursuant to the terms of the Consultant Agreement attached hereto. We understand that as of February 1, 1998, John Celona began his duties under the Consulting Agreement.
 Realty agrees that all expenses of the consulting arrangement shall be charged to Realty's capital account and the deduction for such expenses shall be allocated to Realty.
 Realty agrees to indemnify the Village at Elmhurst for any additional costs or expense associated with Celona's engagement as a consultant. (Pls. ['] Ex. 3, Indemnification Letter.)
After receiving the Indemnification Letter, Mr. Sangermano proceeded to officially execute the Consulting Agreement, backdating the signature to February 1, 1998, [10] and the Village began paying Mr. Celona's weekly salary.
For most of the next six years following the execution of the Consulting Agreement — approximately 1998 through early 2004 — Mr. Celona remained on the Village's payroll as a consultant and the expenses associated with his employment were periodically deducted from Realty's capital account.[11] Toward the end of 2003, however, the relationship between Mr. Celona and the Village began to deteriorate.See Def. ['s] *Page 9 
Ex. 1, Sangermano Grand Jury Test. 34-35. Specifically, according to Mr. Sangermano's grand jury testimony, by December of 2003 the Village had passed the 90 percent (90%) occupancy threshold, which precipitated a need to begin reducing unnecessary marketing expenditures — such as the expenses associated with Mr. Celona's retention as a consultant to the Village. See id. In addition, Mr. Sangermano further testified that Mr. Celona had then recently received some negative publicity which, in Mr. Sangermano's opinion, had substantially diminished his value as a consultant for the Village. Id. 35. Consequently, on January 8, 2004 Mr. Urciuoli and Mr. Sangermano decided to formally end their professional relationship with Mr. Celona. Id. 34.
Shortly after the termination of Mr. Celona as a consultant for the Village in January of 2004, the Rhode Island Attorney General and the United States Attorney for the District of Rhode Island commenced a joint investigation into political corruption involving Mr. Celona (and other politicians). In furtherance of this investigation, the Rhode Island State Police contacted Mr. Sangermano in February of 2004 to discuss Mr. Celona's connection with the Village, and to request the production of certain documents that might be relevant to the ongoing investigation. See id. 12-13. After a thorough investigation, the government eventually uncovered a number of documents it believed confirmed that Mr. Sangermano had in fact discussed legislative issues with Mr. Celona and illegally sought political favors. Subsequent to the discovery of these documents by the government, Mr. Sangermano was formally indicted on January 5, 2006. See Compl. ¶ 34.
As alluded to earlier, Mr. Sangermano was successful in defending the charges brought against him at trial and was found not guilty on all counts. Id. ¶ 35. *Page 10 
Nonetheless, despite the acquittal, Mr. Sangermano has incurred substantial legal fees and expenses with regard to the indictment and defense at trial. Id. ¶ 36. Mr. Sangermano argues that the expenses related to his indictment and trial defense are costs associated with Mr. Celona's engagement as a consultant to the Village.Id. ¶ 37. As such, Mr. Sangermano maintains that he is entitled to indemnification from Realty for these significant expenditures — in his individual capacity and derivatively by way of his status as Director of Sanat.
In an effort to try and recoup these expenses, Mr. Sangermano, through counsel, sent a letter dated October 25, 2006 ("Demand Letter") to Realty demanding that Realty indemnify Mr. Sangermano for his legal fees and expenses. Id. ¶ 38. Despite the Demand Letter, however, Realty has steadfastly refused to indemnify, maintaining that the Plaintiffs cannot establish an enforceable indemnification agreement with Realty that specifically covers attorneys' fees and litigation expenses. For this reason, the Plaintiffs have thus instituted the present action.
 II Standard of Review
Summary judgment is appropriate when, after viewing the admissible evidence in the light most favorable to the non-moving party, "no genuine issue of material fact is evident from `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' and the motion justice finds that the moving party is entitled to prevail as a matter of law." Smilerv. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). "Therefore, summary judgment should enter `against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case * * *.'" Lavoie v. North EastKnitting, Inc., 918 A.2d 225, 228 (R.I. *Page 11 
2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (construing the substantially similar federal rule)). "[C]omplete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."Id. (quoting Celotex, 477 U.S. at 323).
In a summary judgment proceeding, the moving party bears the initial burden of establishing that no genuine issue of material fact exists and can satisfy this burden by "submitting evidentiary materials, such as interrogatory answers, deposition testimony, admissions, or other specific documents, and/or pointing to the absence of such items in the evidence adduced by the parties." Doe v. Gelineau, 732 A.2d 43, 48
(R.I. 1999). If the moving party is able to sustain its burden, then the opposing party must demonstrate the existence of substantial evidence to dispute that of the moving party on a genuine issue of material fact.See Hydro-Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d 950,954 (R.I. 1994); Bourg v. Bristol Boat Co., 705 A.2d 969, 971
(R.I. 1998). Parties opposing summary judgment may not "rely upon mere allegations" but "have an affirmative duty to set forthspecific facts [by affidavit or otherwise] showing that there is a genuine issue of material fact." Bourg, 705 A.2d at 971 (emphasis added).
During a summary judgment proceeding "the court may not pass on the weight or credibility of evidence, but must consider affidavits and pleadings in the light most favorable to the party opposing the motion."Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980). The court's purpose during the summary judgment proceeding is issue finding, not issue determination. Indus. Nat'l Bank v. Peloso, 397 A.2d 1312,1313 (R.I. 1979); Slefkin v. Tarkomian, 238 A.2d 742 (R.I. 1968). Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a *Page 12 
genuine issue concerning any material fact which must be resolved.Rhode Island Hosp. Trust Nat'l Bank v. Boiteau, 376 A.2d 323, 324
(R.I. 1977).
Finally, summary judgment is an extreme remedy that should not be used as a substitute for trial or as a device intended to impose a difficult burden on the non-moving party to save his or her day in court.North Am. Planning Corp. v. Guido, 289 A.2d 423, 425 (R.I. 1972). It is not for the Court to sift out cases that are weak, improbable or unlikely to succeed, and so summary judgment will be denied unless a case is "legally dead" on arrival. Mitchell v. Mitchell,756 A.2d 179, 185 (R.I. 2000).
 III Analysis
This dispute rests on the determination of whether Mr. Sangermano — either individually or derivatively in his capacity as Director of Sanat — is entitled to indemnification from Realty for attorneys' fees and litigation expenses incurred as a result of his indictment and subsequent defense at trial in connection with Mr. Celona's contract with the Village to perform consulting services. The Plaintiffs have set forth a large number of claims in their Complaint — eleven in all — and for the sake of organization and clarity, the Court will divide the claims into two separate groups: (1) claims brought by Sanat derivatively on behalf of the Village; and (2) claims brought by Mr. Sangermano in his individual capacity.
 1 Claims Brought by Sanat Derivatively on Behalf of theVillage A Counts V and VIII: Express Contractual Indemnity
Counts V and VIII of the Plaintiffs' Complaint allege breach of express contractual indemnification and are based on the Indemnification Letter provided to the *Page 13 
Village by Realty. The Plaintiffs' essentially put forth two theories in support of this argument: (i) that the requested Indemnification Letter was an amendment to the Village Operating Agreement; and (ii) the Indemnification Letter has separate legal significance as an enforceable contract between the Village and Realty — apart from the Village Operating Agreement. Regardless of which theory is used, however, the Plaintiffs' cannot overcome a fatal flaw concerning the scope of the Indemnification Letter.
Under both theories, the Plaintiffs' contend that Realty unequivocally agreed to indemnify the Village based on the following language contained in the Indemnification Letter, "Realty agrees to indemnify the Village at Elmhurst for any additional costs or expense associatedwith Celona's engagement as a consultant." (Pls. ['] Ex. 3, Indemnification Letter) (emphasis added.). While a strong argument could be made that this language does create an obligation on the part of Realty to indemnify the Village for costs and expenses related to Mr. Celona's consultancy, the Plaintiffs' have erroneously concluded that the scope of any such obligation to indemnify also covers attorneys' fees and litigation expenses.
It is a well-settled principle in this State that indemnity provisions are to be strictly construed against the party asserting a right of indemnification. Sansone v. Morton Mach. Works, Inc.,957 A.2d 386, 393 (R.I. 2008) ("Our law is well settled that indemnity provisions are valid if sufficiently specific, but are to be `strictly construed against the party alleging a contractual right of indemnification'") (citing Muldowney v. Weatherking Products, Inc., 509 A.2d 441, 443
(R.I. 1986)); see also Gordon v. Capanella Corp., 311 A.2d 844,849-50 (R.I. 1973) (citations omitted) ("Where money is sought because of an indemnity provision in a contract, we have emphasized that such *Page 14 
clause will be strictly construed against the indemnitee."); Dower v.Dower's Inc., 217 A.2d 437, 438 (R.I. 1966) ("Following the rule that indemnity provisions must be strictly construed against the indemnitee, the courts in most of the states have refused to draw inferences from words of general import found in the apparently all-inclusive and catchall language of a general indemnity provision."). While the Rhode Island Supreme Court has yet to address the specific issue of whether attorneys' fees are recoverable under indemnification agreements that do not explicitly provide for the recovery of such fees, when faced with this precise issue, other courts have applied the doctrine of strict construction and refused to permit indemnification for attorneys' fees unless the indemnification provision/agreement specifically so provides. See French v. Isham, 801 F. Supp. 913, 924 (D.R.I. 1992) (indemnification claim for attorneys' fees and court costs incurred in suit failed where the indemnification provision lacked such specific language); see also Woodhaven Homes Realty, Inc. v. Hotz,396 F.3d 822, 825 (7th Cir. 2005) (denying claim of indemnification for attorneys' fees when indemnification agreement "made no mention of attorney fees"); American Building Maintenance Co. v.L'Enfant Plaza Properties, Inc., 655 A.2d 858, 862 (D.C. 1995) ([C]ourts have not readily inferred an obligation to indemnify a party for [attorneys' fees] in the absence of explicit and unambiguous . . . language so providing"); Barber Blue Sea v. Trailer Marine TransportCorp., 725 F. Supp. 1220, 1221-22 (S.D. Fla. 1989); Queen CityCoach Co. v. Lumberton Coach Co., 50 S.E.2d 288 (N.C. 1948).[12][13] Despite this significant common *Page 15 
law precedent, the Plaintiffs' request that this Court find that the broad and unspecific language used in the Indemnification Letter covers attorneys' fees and litigation expenses.
In particular, the French decision poignantly illustrates the application of the principle of strict construction in interpreting the scope of indemnification agreements. In French, a third-party plaintiff sought to recover attorneys' fees from a third-party defendant under an indemnification provision that covered "all loss and damage."French, 801 F. Supp. at 923. The court in French rejected the third-party plaintiff's argument, holding that a "strict construction of the phrase `all loss and damage' does not permit [the court] to read `including attorneys' fees' into the phrase.'"Id. at 924. The court went on to further explain that if the parties had intended the indemnification provision to allow recovery for attorneys' fees, "they could have easily written the [indemnification agreement] to read, `[third-party plaintiff] is hereby indemnified against all loss and damage, including attorneys' fees and relatedlitigation expenses" . . . Id. Due to the failure to include this express language in the indemnification provision, the court inFrench summarily denied the third-party plaintiff's claim of indemnification for attorneys' fees and litigation expenses.Id.
Applying the reasoning in French — together with the concurring authority — to the facts of the instant matter, it is clear that the Plaintiffs' claims for contractual indemnification should be dismissed. Like the indemnification agreement in French, here, the Indemnification Letter does not explicitly provide for the indemnification of *Page 16 
attorneys' fees or litigation expenses. See Pls. ['] Ex. 3, Indemnification Letter. Had the parties intended the Indemnification Letter to cover indemnification for attorneys' fees and litigation expenses, they could have, and more importantly, should have, expressly provided for such.[14] See French,801 F. Supp. at 924.[15] However, such language is conspicuously absent from the Indemnification Letter. Consequently, pursuant to the doctrine of strict construction, the phrase, "any additional costs or expense" must be construed to exclude attorneys' fees and litigation expenses, for as articulated by the French court, "it is not within the province of the Court to retroactively reformulate the terms of the parties' [agreement]." French, 801 F. Supp. at 924. Accordingly, in the absence of express language providing for indemnification of attorneys' fees or litigation expenses in the Indemnification Letter, the Plaintiffs' claims for contractual indemnification are denied and summary judgment shall enter for Realty on Counts V and VIII. *Page 17 
 B Counts VI, VII, IX, and X: Equitable ContractualIndemnity a. Counts VI and IX
In Muldowney v. Weatherking Products, Inc., 509 A.2d 441 (R.I. 1986), the Rhode Island Supreme Court laid out a three-part test that must be met in order for a prospective indemnitee to succeed on a claim of equitable indemnification. Muldowney, 509 A.2d at 443. First, the party seeking indemnity must be liable to a third party.Id. Second, the party from whom indemnity is sought must also be liable to a third party. Id. Third, as between the prospective indemnitee and the indemnitor, the obligation ought to be discharged by the indemnitor. Id. Further, the basic theory underlying the concept of equitable indemnification is that "one who has been exposed to liability solely as the result of a wrongful act of another should be able to recover from that party. Id. "If another person has been compelled to pay damages that should have been paid by the wrongdoer, the latter becomes liable to the former." Id.
Considering the three-pronged test laid out in Muldowney, a threshold question is whether Sanat, as the prospective indemnitee, is liable to a third party. The Plaintiffs contend that Sanat is liable to Mr. Sangermano — through Sangermano Realty — for his legal expenses pursuant to Sanat's Agreement of Limited Partnership and the First Amendment to the Sanat Agreement of Limited Partnership. The logic behind the Plaintiffs' assertion flows in the following manner.
First, the Plaintiffs' maintain that Mr. Sangermano is entitled to indemnification for his attorneys' fees and litigation expenses from Sangermano Realty by virtue of his position as an officer and director of Sangermano Realty. See Pls. ['] Ex. 8, By-Laws of Sangermano Realty, Article VIII, § 1. Pursuant to the By-Laws of Sangermano Realty, *Page 18 
any officer or director — including Mr. Sangermano — who is a party to "[A]ny threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he/she is or was a director or officer of [Sangermano Realty]," is entitled to indemnification from Sangermano Realty for any "expenses (including attorneys' fees), judgments, fines and amounts paid in settlement . . . in connection with such action, suit or proceeding. . . ." Id. (emphasis added.). Second, Sangermano Realty is entitled to indemnification from Sanat pursuant to Sangermano Realty's status as a general partner of Sanat. See Pls. ['] Exhibit 6, Sanat Agreement of Limited Partnership, Article VI, § 6.6.According to the Sanat Agreement of Limited Partnership and the First Amendment to the Sanat Agreement of Limited Partnership, general partners are entitled to indemnity:
 [A]gainst any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Partnership, provided that the same were not the result of an act or failure to act constituting misconduct, negligence, misrepresentation or breach of covenant, warranty or fiduciary duty. Id. (emphasis added.).
After careful examination of the facts, the Court concludes that, based on the unique contractual relationship between the parties, coupled with the express language contained both in the Sanat Agreement of Limited Partnership and the By-Laws of Sangermano Realty, the prospective indemnitee — Sanat — is likely liable to a third party — Sangermano Realty.[16] Prong two of the Muldowney test, however, is more problematic for the Plaintiffs. Irrespective of whether the indemnitor is considered *Page 19 
Realty or the Village, for the following reasons, the Plaintiffs are simply unable to establish that the party from whom indemnity is sought is liable to a third party.
To start with, if the indemnitor is considered Realty, then the Plaintiffs' theory essentially rests on Realty being liable to the Village for Mr. Sangermano's legal fees based on the language contained in the Indemnification Letter. However, as noted previously, the general principle adopted by the Rhode Island Supreme Court of strict construction of indemnity agreements results in a conclusion by this Court that the broad and unspecific language of the Indemnification Letter does not cover attorneys' fees and litigation expenses.[17][18]
Alternatively, if the indemnitor is considered the Village, then the Plaintiffs' theory is based on the Village being liable to Sanat — by way of its status as a Member of the Village — for Mr. Sangermano's attorneys' fees and litigation expenses. See Pls. ['] Exhibit 7, the Village Operating Agreement, Article VI, § 6.7. The trouble with this contention, again, is that the indemnity provision located in the Village Operating Agreement does not specifically reference indemnity for attorneys' fees and litigation expenses.[19] Therefore, even though Sanat may have a general right to indemnification from the Village, absent express language specifically referencing indemnification for attorneys' fees and litigation expenses, the doctrine of strict construction of *Page 20 
indemnification agreements leads this Court to conclude that Sanat is not entitled to indemnification from the Village for Mr. Sangermano's attorneys' fees and litigation costs.[20] Accordingly, the Plaintiffs' cannot establish that the prospective indemnit or — Realty and/or the Village — is liable to a third party, which is specifically required in order to satisfy prong two of the Muldowney test. Thus, due to the Plaintiffs' inability to successfully meet prong two of theMuldowney test, the Plaintiffs' claims for equitable contractual indemnification are denied and summary judgment shall enter for the Defendant on Counts VI and IX.[21][22][23]
 2 Claims Brought on Behalf of Mr. Sangermano in his Individual Capacity A Count I: Intended Third Party Beneficiary
Under this theory of liability, Mr. Sangermano asserts that he was an intended third party beneficiary of the Indemnification Letter sent by Mr. Urciuoli — as President of Realty — to Mr. Sangermano — as Manager of the Village — on June 17, 1998. (Compl. ¶ 49-58.) The fundamental problem with Mr. Sangermano's argument, however, is that *Page 21 
he has failed to establish the existence of an enforceable indemnification agreement between Realty and the Village that expressly promises to indemnify him personally.
To succeed on a theory of liability based on one's status as an intended third party beneficiary, the Plaintiff must overcome a high burden. "[T]here is a presumption that parties contract only for the benefit of themselves, and a contract will not be considered as having been made for the use and benefit of a third person unless itclearly appears that such was the intention of the parties."Brown v. Summerlin Associates, Inc., 614 S.W.2d 227, 229 (Ak. 1981) (emphasis added); see also Blu-J Inc. v. Kemper C.P.A. Group,916 F.2d 637, 640 (11th Cir. 1990) ("In order for one to qualify as a third party beneficiary under a contract, it must be shown that the intent and purpose of the contracting parties was to confer a direct and substantial benefit upon the third party"); Forcier v.Cardello, 173 B.R. 973, 985 (D.R.I. 1994) ("Incidental third party beneficiaries of a contract do not have a right to recovery on the contract in the event of a breach"); Davis v. New England PestControl, 576 A.2d 1240, 1242 (R.I. 1990) (recognizing general rule that only intended, and not incidental, third party beneficiaries can maintain action for damages resulting from breach of contract between two other contracting parties). In the past, the Rhode Island Supreme Court has looked to the Restatement (Second) of Contracts for guidance in determining the rights and status of third party beneficiaries. See e.g., Finch v. Rhode Island GrocersAssn., 175 A.2d 177, 181 (1961). The Restatement basically requires that the parties directly and unequivocally manifest intent to benefit a third party in order for that third party to be considered an intended beneficiary.[24] Forcier, 173 B.R. at 985. Therefore, "[T]he intent to benefit the third party *Page 22 
must be clearly expressed in the contract." U.S. v. United StatesAuto Ass'n, 968 F.2d 1000, 1001-02 (10th Cir. 1992);see also Blu-J Inc., 916 F.2d at 640 (plaintiff must establish that "the intent and purpose of the contracting parties was to confer a direct and substantial benefit upon the third party").
In the instant matter, Mr. Sangermano contends that he was an intended third party beneficiary of the Indemnification Letter because (i) he was the only person authorized to sign the letter on behalf of the Village, and (ii) Realty dealt directly and exclusively with him and his attorney for purposes of signing the Consulting Agreement. Based on the evidence before the Court, however, Mr. Sangermano has failed to establish that Realty and the Village directly and unequivocally intended to benefit him.
While the Indemnification Letter may have been addressed to Mr. Sangermano, at the time the letter was sent Mr. Sangermano was the acting Manager of the Village, so he was naturally the person to whom Realty would address a letter regarding the Village. Mr. Sangermano cannot be considered an intended third party beneficiary of a contract simply because he was the person with whom Realty had to communicate in trying to consummate an agreement with the Village. If that were indeed the case, then virtually every agent with the authority and power to sign and negotiate contracts on behalf of his or her principal would theoretically be an intended third party beneficiary of any contract *Page 23 
entered into between the agent's principal and an outside party — regardless of whether the contract at issue expressly promised to benefit the agent personally. Unfortunately for Mr. Sangermano, the law requires more than this, and there must be a direct andunambiguous intention to benefit Mr. Sangermano contained within the Indemnification Letter in order for him to rightfully claim that he is an intended third party beneficiary of that agreement.[25]
Mr. Sangermano cannot point to any specific language in the Indemnification Letter — aside from Realty's addressing of the letter to him as Manager of the Village — in which he is individually referenced.See Pls. ['] Ex. 3, Indemnification Letter. The terms of the Indemnification Letter directly and unequivocally contemplate that only the Village — the entity, not the individual manager — would be indemnified by Realty:
 Realty agrees to indemnify the Village at Elmhurst for any additional costs and expenses associated with Celona's engagement as a consultant. Id. (emphasis added.).
Mr. Sangermano's name is conspicuously absent from this portion of the Indemnification Letter and one could hardly deduce from a plain reading of the above referenced excerpt that the parties clearly and unequivocally intended Mr. Sangermano to be a third party beneficiary of Realty's promise to indemnify the Village. Accordingly, given that the Indemnification Letter does not contain any clear expression of an intention to benefit Mr. Sangermano individually, summary judgment shall enter for Realty on Count I. *Page 24 
 B Count II: Promissory Estoppel
Count II of the Plaintiffs' Complaint alleges that Realty is liable to Mr. Sangermano based on the doctrine of promissory estoppel. (Compl. ¶ 59-64.). Mr. Sangermano contends that he detrimentally relied on Realty's promise of indemnification contained in the Indemnification Letter and has and will continue to suffer damages as a result. (Compl. ¶ 63-64.) This Court holds, however, that despite Mr. Sangermano's assertions, he has failed to demonstrate that all the necessary elements of the doctrine of promissory estoppel have been satisfied.
Promissory estoppel has typically "[B]een invoked as a substitute for consideration, rendering a gratuitous promise enforceable as a contract." East Providence Credit Union v. Geremia, 239 A.2d 725,727 (1968). The Rhode Island Supreme Court has defined promissory estoppel as, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance, [and therefore] is binding if injustice can be avoided only by enforcement of the promise." Filippi v. Filippi, 818 A.2d 608, 626 (R.I. 2003) (quoting Alix v. Alix, 497 A.2d 18, 21 (R.I. 1985)); seealso Restatement (Second) of Contracts § 90 at 242 (1981). Of fundamental importance to any successful promissory estoppel action is the establishment of a clear and unambiguous promise. See Filippi,818 A.2d at 625; see also B.M.L. Corp. v. Greater Providence DepositCorp., 495 A.2d 675, 677 (R.I. 1985). Further, in Filippi, the Rhode Island Supreme Court proffered the following three-element test that must be established in order to invoke the doctrine of promissory estoppel: (1) a clear and unambiguous promise, (2) reasonable and justifiable reliance upon the promise, and (3) detriment to the promisee, caused by his or *Page 25 
her reliance on the promise. Filippi, 818 A.2d at 626; see alsoDellagrotta v. Dellagrotta, 873 A.2d 101, 110 (R.I. 2005).
Regarding element one, Mr. Sangermano has failed to establish that Realty made a clear and unambiguous promise to indemnify him individually. Specifically, Mr. Sangermano asserts that Realty promised to indemnify him — along with the Village — as Manager of the Village for "[A]ny additional costs or expense associated with Celona's engagement as a consultant." See Compl. ¶ 60-63. As discussed previously, however, nowhere within the four corners of the Indemnification Letter is it ever explicitly stated that Realty intended to indemnify Mr. Sangermano. See Pls. ['] Ex. 3, Indemnification Letter. To the contrary, the precise language of the Indemnification Letter indicates that Realty promised to indemnify only the Village, not Mr. Sangermano individually. Id. In fact, the actual provision in the letter addressing the topic of indemnification fails to even reference Mr. Sangermano.[26] Consequently, because the necessary element of a clear and unambiguous promise needed to succeed on a promissory estoppel claim has not been sufficiently established, summary judgment shall enter for Realty on Count II.[27]
 C Count III: Fraud
In general, Rhode Island rules allow for liberal pleading standards to be entertained in our courts. In particular, Super. R. Civ. P. 8(a) provides that a complaint "shall contain (1) a short and plain statement of the claim showing that the pleader is *Page 26 
entitled to relief, and (2) a demand for judgment for the relief the pleader seeks." It is well-settled in Rhode Island that the pleader need not allege "the ultimate facts that must be proven in order to succeed on the complaint." See Haley v. Town of Lincoln, 611 A.2d 845, 848
(R.I. 1992). Rather, a pleading need only provide its opponent with "fair and adequate notice of the type of claim being asserted."Seeid.A claim for fraud, however, is subject to the greater pleading standards set forth in Super. R. Civ. P. 9(b), which requires that the circumstances constituting fraud or mistake be stated withparticularity. See Robert B. Kent et el., Rhode IslandCivil and Appellate Procedure, § 9.2 (2006). Specifically, Rule 9(b) provides:
 (b) Fraud, Mistake, Conditions of the Mind. In all avernments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Super. R. Civ. P. Rule 9(b).
Although neither the text of this rule, nor opinion of the Rhode Island Supreme Court, explicitly state the degree of particularity with which a party must plead "circumstances constituting fraud," as a general rule, sufficient particularity depends upon the nature of the case involved and should be "determined in light of the purpose of the rule to give fair notice to the adverse party and to enable him to prepare his responsive pleading." Robert B. Kent et el., Rhode IslandCivil and Appellate Procedure, § 9.2 (2006); see also Grant v.Wilcox, 145 A. 306 (R.I. 1929). As further guidance, federal case law has provided some examples of what constitutes sufficient particularity under the federal counterpart to Super. R. Civ. P. 9(b).[28] At a minimum, details such as *Page 27 
"time, place, and contents of the false representations or omissions, as well as the identity of the person making the misrepresentation . . . and what that defendant obtained thereby" are usually required.See Wright Miller, Federal Practice and Procedure, Civil 3d, § 1297 at 74 (2004); see also e.g., Greebel v. FTP Software,Inc., 194 F.3d 185, 193 (1st Cir. 1999) (Rule 9(b) requires specification of time, place, and content of alleged false representation); Learning Express, Inc. v. Ray-Matt Enterprises,Inc., 74 F. Supp. 2d 79, 85 (D.Mass. 1999) (must allege specific times, dates, places, and other details of fraud in order to comply with the particularity requirement of Rule 9(b)); Guilbeault v. RJReynolds Tobacco Co., 84 F. Supp. 2d 263, 269 (D.R.I. 2000) (complaint must identify the "time, place, and content of the alleged false or fraudulent representations").
The Court notes that while the Plaintiffs' did include this Count in their Complaint, they failed to delineate — both in their Complaintand in their Memorandum in Support of their Motion for Summary Judgment — the specifics of any false representation or fraud committed by Realty.[29][30] As alluded to previously, the heightened pleading standards associated with a claim for fraud require the Plaintiffs to *Page 28 
provide the Defendant — as well as the Court — with sufficient details regarding the fraud claim. The Court hastens to add that simply restating the elements of the fraud claim in conclusory fashion in the Complaint — which is what the Plaintiffs did here — can hardly be considered sufficient particularity. See Grant, 145 A. 306 ("The general rule of pleading fraud is that it must be distinctly andspecifically charged in a [complaint] seeking relief on that ground * * * The specific facts must be alleged from which the court can find that fraud has actually been perpetrated") (emphasis added); see alsoe.g., Guilbeault, 84 F. Supp. 2d at 281 (complaint uses such broad terms that it goes no further than restating elements of claim, and thus it does not give defendant adequate notice to answer fraud claim). For this reason, Count III of the Plaintiffs' Complaint is dismissed. See Super. R. Civ. P. Rule 9(b) ("In all avernments of fraud or mistake, the circumstances constituting fraud or mistakeshall be stated with particularity.") (emphasis added.);see also Grant, 50 R.I. 84, 145 A. 306; see also e.g.,Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 14
(1st Cir. 1984) (Complaint alleging false and misleading statements failed to state circumstances constituting fraud with particularity required by Rule 9(b) when plaintiff offered nothing more substantial than conclusory allegations of fraud).
 D Count IV: Negligent Misrepresentation
In Count IV of the Complaint, Mr. Sangermano asserts that Realty knowingly made a misrepresentation of material fact by promising him that he would be indemnified for any additional costs or expenses related to the hiring of Mr. Celona. See Compl. ¶ 71-72. Further, Mr. Sangermano also claims that Realty made the misrepresentation in order to induce him to sign the Consulting Agreement — which he did.See id. ¶ 73. *Page 29 
Finally, Mr. Sangermano asserts that as a result of his justifiable reliance on Realty's misrepresentation, he has and will continue to suffer damages. Id. ¶ 74-75. A review of Mr. Sangermano's allegations, together with the applicable law, compel the Court to conclude, under the particular circumstances of this case, that this cause of action cannot be sustained.
In order to establish a prima facie case of negligent misrepresentation, the plaintiff must establish the following four elements: "(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. Manchesterv. Pereira, 926 A.2d 1005, 1012 (R.I. 2007) (quoting Mallette v.Children's Friend and Service, 661 A.2d 67, 69 (R.I. 1995)). In arguing that Realty made a material misrepresentation, Mr. Sangermano points to the language contained in the Indemnification Letter. In the Indemnification Letter, however, Realty expressly promised to indemnify the Village, not Mr. Sangermano individually, for "any additional costs or expense incurred as a result of Celona's engagement as a consultant." (Pls. ['] Ex. 3, Indemnification Letter.) Mr. Sangermano's name is noticeably absent from the provision in the letter addressing the issue of indemnification. See id. Therefore, based on an objective facial analysis of the language contained in the Indemnification Letter, the Court concludes that Realty did not knowingly or negligently misrepresent to Mr. Sangermano that he would be indemnified for any additional costs or expenses associated *Page 30 
with Mr. Celona's engagement as a consultant with the Village. Hence, because Mr. Sangermano has not satisfied the threshold requirement of a material misrepresentation needed to succeed on a negligent misrepresentation claim, summary judgment shall enter for Realty on Count IV.[31]
 IV Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court finds that Realty is not liable to Mr. Sangermano — individually or derivatively in his capacity as Director of Sanat — for indemnification of his attorneys' fees and litigation expenses incurred as a result of his federal indictment and subsequent trial in connection with Mr. Celona's contract with the Village to perform consulting services. Furthermore, given that both parties agree this is the determinative issue and there remains no other material fact in question or in dispute on the issue of liability, the Court hereby denies the Plaintiffs' Motion for Summary Judgment on all counts, and grants the Defendant's Cross-Motion for Summary Judgment.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] For convenience, Mr. Sangermano and Sanat will be periodically jointly referred to as "Plaintiffs."
[2] Sanat's claims are derivative causes of action brought by Mr. Sangermano in his capacity as Director of Sanat — a member of the Village at Elmhurst LLC and 50% owner — on behalf of the Village at Elmhurst LLC. (Compl. ¶ 13.)
[3] While the Plaintiffs' actual motion is titled as a motion for summary judgment, in their papers they request only partial summary judgment. As a result, the motion shall be treated accordingly.
[4] It should be noted that following a three-week trial in the United States District Court for the District of Rhode Island, Mr. Sangermano was acquitted on all counts relating to his indictment. (Compl. ¶ 35.)
[5] See Pls. ['] Ex. 3, Indemnification Agreement.
[6] According to the Plaintiffs, the contractual obligations governing the relationship between the parties flow as follows. First, pursuant to the By-Laws of Sangermano Realty, Inc., any officer or director — including Mr. Sangermano — who is a party to "any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he/she is or was a director or an officer of Sangermano Realty," is entitled to indemnification from Sangermano Realty, Inc. (Pls. ['] Ex. 8, By-Laws of Sangermano Realty, Article VIII, § 1.) Mr. Sangermano claims that based on his position as an officer and director, he is entitled to indemnification from Sangermano Realty. See id. Secondly, the Plaintiffs claim that Sangermano Realty is entitled to indemnification from Sanat based upon (i) its status as a general partner of Sanat; and (ii) the indemnification provision contained in Sanat's Agreement of Limited Partnership and the First Amendment to the Sanat Agreement of Limited Partnership, which provides that all general partners are entitled to indemnity "[A]gainst any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them . . . in connection with the Partnership. . . ." (Pls. ['] Ex. 6, Sanat Agreement of Limited Partnership, Article VI, § 6.6.) Thirdly, since Sanat is a 50% interest holder of the Village, the Plaintiffs assert that pursuant to the indemnification provision contained in the Village Operating Agreement — providing that "[The Village] shall indemnify . . . each Member from and against any and all losses, claims, damages, liabilities or expenses of whatever nature, as incurred, arising out of or relating to the fact that such party was or is a Member of the [Village]" — Sanat is entitled to indemnification from the Village. (Pls. ['] Ex. 7, the Village Operating Agreement, Article VI, § 6.7.) Lastly, the Plaintiffs claim that pursuant to the Indemnification Letter created by Realty to indemnify the Village for "any additional costs or expense associated with Celona's engagement as a consultant," the Village is entitled to indemnification from Realty. Essentially, the Plaintiffs assert that based on this unique contractual arrangement governing the parties, Realty has an obligation to indemnify the Village for Mr. Sangermano's legal fees, which will eventually flow to Mr. Sangermano individually through the string of four related entities formerly mentioned. See Compl. ¶ 22-33.
[7] The Medical Center is a not-for-profit corporation incorporated under the laws of the State of Rhode Island for the purpose of being a parent company of Roger Williams Hospital ("Hospital") and providing fund raising activities for the Hospital. (Pls. ['] Ex. 1, Federal Indictment, ¶ 4.)
[8] Realty — a wholly owned subsidiary of the Medical Center — is a for-profit realty corporation incorporated under the laws of the State of Rhode Island that owns and manages real estate for the benefit of the Medical Center. (Pls. ['] Ex. 1, Federal Indictment, ¶ 4.)
[9] Sanat is a Rhode Island limited partnership formed under the laws of the State of Rhode Island, located at 715 Putnam Pike, Greenville, Rhode Island. (Compl. § 3.) From April 13, 1998 to the present, Sangermano Realty and Natco Products Corporation have been the sole general partners of Sanat. Id.
[10] See Def. ['s] Ex. 1, Sangermano Grand Jury Test. 56-57.
[11] In the few instances where there were not enough funds in the capital account to cover the consulting expenses, the Village notified Realty of the shortage and Realty in turn transferred adequate funds to the Village to cover the payments to Mr. Celona. See Def. ['s] Ex. 1, Sangermano Grand Jury Test. 85-87.
[12] While not binding precedent, it is noteworthy that in Godin v.Bristol Industrial Park, Inc., No. 95-6210, 2000 WL 276816, *1 (R.I.Super. 2000), the trial justice — citing the French decision — ruled that absent express language in an indemnification provision referencing attorneys' fees or litigation expenses, "the provision must be construed to exclude such costs." Godin, 2000 WL 276816, at *2.
[13] Further, it is important to note that, under Rhode Island law, the term "costs" generally does not include attorneys' fees.Moore v. Ballard, 914 A.2d 487, 498 (R.I. 2007); see also BlueCross Blue Shield of Rhode Island v. Najarian, 911 A.2d 706, 710
(R.I. 2006) (attorneys' fees are not traditionally included within the definition of "costs") (citing Di Iorio v. Cantone, 144 A. 148,149 (R.I. 1929)); Waldeck v. Piner, 488 A.2d 1218, 1220 (R.I. 1985) ("[T]his court has long held that `costs,' without more, will not be interpreted to include counsel fees.")
[14] Additionally, the Plaintiffs' submit that they are entitled to attorneys' fees because Realty failed to restrict the scope of the Indemnification Letter and instead used the broadest possible language. According to case law, however, if the Plaintiffs' wanted the Indemnification Letter to cover attorneys' fees and litigation expenses, it was the Plaintiffs' responsibility to make sure such a provision was included. See French, 801 F. Supp. at 924; see also WoodhavenHomes Realty, 396 F.3d at 822; American Building MaintenanceCo., 655 A.2d at 862; Barber Blue Sea, 725 F. Supp. at 1221-22;Queen City Coach Co., 50 S.E.2d at 288. Furthermore, the Court points out that while explicit language providing for the recovery of attorneys' fees is absent from the Indemnification Letter — as well as the indemnification provision contained in the Village Operating Agreement — such language is included in the indemnification clauses found in both the By-Laws of Sangermano Realty and the Sanat Agreement of Limited Partnership. Thus, if the parties wanted the Indemnification Letter and the Village Operating Agreement to cover indemnification for attorneys' fees and litigation expenses, the parties could have easily included such language — as was done in the By-Laws of Sangermano Realty and the Sanat Agreement of Limited Partnership.
[15] See also Woodhaven Homes Realty, 396 F.3d at 822;American Building Maintenance Co., 655 A.2d at 862; Barber BlueSea, 725 F. Supp. at 1221-22; Queen City Coach Co.,50 S.E.2d at 288.
[16] Sanat's liability to Sangermano Realty would of course be contingent upon Sangermano Realty proving that, among other things, its loss was "not the result of an act or failure to act constituting misconduct, negligence, misrepresentation or breach of covenant, warranty or fiduciary duty." (Pls. ['] Exhibit 6, Sanat Agreement of Limited Partnership, Article VI, § 6.6.)
[17] See supra Part 1, A.
[18] See Sansone v. Morton Mach. Works, Inc., 957 A.2d at 393
(citing Muldowney, 509 A.2d at 443); Gordon,311 A.2d at 849-50; Dower, 217 A.2d at 438-39; see also French,801 F. Supp. at 924; Woodhaven Homes Realty, Inc., 396 F.3d at 822;American Building Maintenance Co., 655 A.2d at 862; Barber BlueSea, 725 F. Supp. at 1221-22; Queen City Coach Co.,50 S.E.2d at 288.
[19] In particular, the indemnification language contained in Article VI, § 6.7 of the Village Operating Agreement provides that:
 [C]ompany shall indemnify . . . each Member from and against any and all losses, claims, damages, liabilities or expenses of whatever nature, as incurred, arising out of or relating to the fact that such party was or is a Member of the [Village]. (Pls. ['] Exhibit 7, the Village Operating Agreement, Article VI, § 6.7.)
[20] See supra notes 17-18.
[21] With respect to prong three of the Muldowney test, the Plaintiffs did not provide any specific proof or reasoning as to why the prospective indemnitor(s), as opposed to the prospective indemnitee, should bear the burden of the financial obligation. Nonetheless, even if the Plaintiffs had provided such information, those efforts would have been futile because the Plaintiffs were unable to carry their burden with respect to prong two.
[22] It should be noted that if, alternatively, the prospective indemnitee is considered the Village — based on the fact that this is a derivative claim brought by Sanat on behalf of the Village — the outcome would still be the same. In order to meet prong one of theMuldowney test, it must be established that the prospective indemnitee is liable to a third party. If the Village is considered the prospective indemnitee, then in order to satisfy this requirement, the Plaintiffs would have to establish that the Village is liable to a third party — in particular, Sanat. As discussed in the text, however, although Sanat may have a general right to indemnification from the Village, because the indemnification provision in the Village Operating Agreement does not specifically reference indemnification for attorneys' fees and litigation expenses, Sanat does not have a right to indemnification from the Village for Mr. Sangermano's attorneys' fees and legal expenses. Thus, regardless of whether the prospective indemnitee is considered the Village or Sanat, the Plaintiffs' claims for equitable contractual indemnification are denied.
[23] The Plaintiffs failed to address the merits of Counts VII and X — Breach of Implied Covenant of Good Faith and Fair Dealing — in their memorandum in support of their Motion for Summary Judgment.
[24] Section 302 of the Restatement (Second) of Contracts
provides:
 (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
 (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
 (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the intended performance.
 (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary. Restatement (Second) of Contracts, § 302; see also Forcier v. Cardello, 173 B.R. at 985.
[25] See Brown, 614 S.W.2d at 229; Forcier, 173 B.R. at 98540; Blu-J Inc., 916 F.2d at 6;; United States AutoAss'n, 968 F.2d at 1001-02; see also Davis, 576 A.2d at 1242;Finch, 175 A.2d at 181; see also Restatement (Second) ofContracts, § 302.
[26] As referenced supra pp. 13, 23, the specific indemnification language included in the Indemnification Letter provides that, "Realty agrees to indemnify the Village at Elmhurst for any additional costs or expense associated with Celona's engagement as a consultant." (Pls. ['] Ex. 3, Indemnification Letter) (emphasis added.).
[27] Given that Mr. Sangermano has not satisfied the threshold requirement of the existence of a clear and unambiguous promise, all arguments concerning elements two and three are essentially moot. As such, the Court will refrain from addressing the merits of any arguments pertaining to elements two and three at this particular juncture.
[28] Federal Rule of Civil Procedure 9(b) is substantially similar in substance and effect to Super. R. Civ. P. 9(b) and reads as follows:
 (b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. Fed.R.Civ.P. 9(b).
[29] Further, regarding the fraud claim, in their Complaint, the Plaintiffs' merely restate the elements of a claim for fraud and provide nothing more than conclusory statements to describe the circumstances constituting fraud:
 Roger Williams Realty knowingly made a false representation. By making the false representation, Roger Williams Realty intended to induce Mr. Sangermano to rely on the false representation. Mr. Sangermano justifiably relied on Roger Williams Realty's false representation. As a result of his reliance on Roger Williams Realty's false representation, Mr. Sangermano has and will continue to suffer damages. (Compl. ¶ 66-69.)
[30] As noted, the Plaintiffs failed to brief the fraud claim in their Memorandum in Support of their Motion for Summary Judgment. Thus, not only is the complaint unduly vague with respect to the fraud claim, but, what's more, the Plaintiffs' made no attempt to subsequently cure this defect by adequately addressing the issue in their memoranda submitted to the Court.
[31] Additionally, assuming arguendo that Mr. Sangermano had been able to establish any of his individual claims delineated in Counts I, II, III, and IV, he would still be unable to recover his attorneys' fees and litigation expenses based on the language of the Indemnification Letter because, as articulated previously, pursuant to the doctrine of strict construction of indemnification agreements, in order to recover attorneys' fees and litigation expenses, Mr. Sangermano must identify precise language providing for such in the Indemnification Letter — which, as previously discussed in detail, he is unable to do. See supra note 20; see also supra Part 1, A-B.